1 │ KAREN MATTESON, Cal. Bar No. 102103
  │ KELLY BOWERS, Cal. Bar No. 164007
2 │ MARTIN J. MURPHY, Cal. Bar No. 130693
  │ ADAM SCHNEIR, Cal. Bar No. 169265
3 │
  │ Attorneys for Plaintiff
4 │ Securities and Exchange Commission
  │ Randall R. Lee, Regional Director
5 │ Sandra J. Harris, Associate Regional Director
  │ 5670 Wilshire Boulevard, 11th Floor
6 │ Los Angeles, California 90036-3648
  │ Telephone:  (323) 965-3998
7 │ Facsimile:  (323) 965-3908

8

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

11 │ SECURITIES AND EXCHANGE      Case No. 03 - 2834  (RNBx)
12 │ COMMISSION,
   │                              **COMPLAINT FOR VIOLATIONS**
13 │              Plaintiff,       **OF THE FEDERAL SECURITIES**
   │                              **LAWS**
14 │      v.
15 │ JOHN C. BOHAN, LUCREZIA
   │ BICKERTON, MARK D. ROAH, and
16 │ CHANTEL J. LOO,
17 │              Defendants.

19 │      Plaintiff Securities and Exchange Commission ("Commission") alleges as

20 │ follows:

## JURISDICTION AND VENUE

22 │      1.    This Court has jurisdiction over this action pursuant to Sections

23 │ 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15

24 │ U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e)

25 │ and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§

26 │ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa.

27 │      2.    Venue is proper in this district pursuant to Section 22(a) of the

28 │ Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C.

APR 23 2003

1  § 78aa, because certain of the transactions, acts, practices and courses of conduct

2  constituting violations of the federal securities laws occurred within this District.

3  **SUMMARY**

4      3.    This action concerns a financial fraud perpetrated on the investing

5  public by the former top management and finance officers of MaxWorldwide, Inc.,

6  formerly known as L90, Inc. ("L90"), an Internet advertising firm formerly located

7  in Marina Del Rey, California, and now based in New York, New York.

8  Defendants John C. Bohan, Lucrezia Bickerton, Mark D. Roah, and Chantel J. Loo

9  were, respectively, L90's Chief Executive Officer, Vice President of Finance,

10  Senior Vice President of Business Development, and Controller.  Bohan and Roah

11  were also Directors of L90.

12      4.    From L90's third quarter 2000 ("Q3 2000") through the third quarter

13  of 2001, each of the defendants engaged in fraudulent conduct to overstate L90's

14  revenues.  The principal scheme to generate false revenues involved barter

15  transactions in which L90 recognized revenue by "check-swapping" or "round-

16  tripping" cash with one or more third party companies.  In these transactions, L90

17  exchanged advertising on its proprietary website, webMillion.com, with

18  advertising on another company's website and, to generate revenue from the

19  barter, swapped cash with the other company.  Initially, L90 merely swapped

20  checks of identical or similar amounts with the other company.  Then, in order to

21  better hide the transactions from its auditor, L90 began round-tripping the money

22  through multiple companies.  In the second revenue-generating scheme, L90

23  booked revenue for a large advertising campaign despite the fact that Bohan and

24  Bickerton knew from the outset of the campaign that L90 would never receive

25  payment from the client.  As a result of these fraudulent transactions, L90

26  overstated its revenue in Commission filings by at least $4.9 million, or 9.2%, and

27  by as much as 29% in one quarter, and was thereby able to meet stock analysts'

28  revenue estimates in all but one quarter during the relevant period.

1        5.     Bohan orchestrated and approved the fraudulent barter and

2   advertising campaign schemes; lied to L90's auditor about the transactions related

3   to these schemes; and signed L90's public filings with the Commission that

4   incorporated false financial information.  Bickerton helped orchestrate, implement,

5   and facilitate the barter and advertising schemes, recorded revenue on the

6   transactions related to these schemes into L90's books and records, and lied to

7   L90's auditor about the transactions related to these schemes.  Roah negotiated,

8   implemented, and facilitated the fraudulent barter transactions with the outside

9   companies, misappropriated money from two of the round-trip transactions, lied to

10   L90's auditor about certain barter transactions, and signed L90's public filings

11   that incorporated false financial information.  Loo helped coordinate some of the

12   check-swaps, was involved in recording some of the barter transactions into L90's

13   books and records, and lied to L90's auditor about L90's barter transactions.

14        6.     The defendants, by engaging in the conduct alleged in this Complaint,

15   have violated the antifraud provisions of Section 17(a) of the Securities Act, 15

16   U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and

17   Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; aided and abetted violations of the

18   issuer reporting provisions of Section 13(a) of the Exchange Act, 15 U.S.C. §

19   78m(a), and Rules 12b-20, 13a-1 and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20,

20   240.13a-1 & 240.13a-13; violated the recordkeeping and internal control

21   provisions of Section 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5), and

22   Rule 13b2-1 thereunder, 17 C.F.R. § 240.13b2-1; and lied to L90's auditor in

23   violation of Exchange Act Rule 13b2-2, 17 C.F.R. § 240.13b2-2.  Defendant

24   Roah also aided and abetted violations of the antifraud provisions of Section 10(b)

25   of the Exchange Act and Rule 10b-5 thereunder by certain former employees of

26   Homestore.com, Inc., one of the other parties to two of the round-trip transactions.

27                       **THE DEFENDANTS**

28        7.     John C. Bohan ("Bohan") is a resident of Manhattan Beach,

1   California.  Bohan co-founded L90 and was its Chief Executive Officer (CEO),

2   President, and a member of its Board of Directors from the company's inception in

3   1997 until he resigned all positions in March 2002.

4         8.    Lucrezia Bickerton ("Bickerton") is a resident of Hermosa Beach,

5   California.  Bickerton was L90's Director of Finance from March 1999 to July

6   1999, its Controller from July 1999 to January 2000, and its Vice President of

7   Finance from January 2000 until she resigned on February 1, 2002.  Despite

8   leaving L90 on several occasions in 2001, Bickerton maintained the same

9   responsibilities she had as Vice President of Finance while being paid by L90 as a

10  consultant.  Bickerton reported to Bohan.

11        9.    Mark D. Roah ("Roah") is a resident of Manhattan Beach, California.

12  Roah co-founded L90, was a member of the Board of Directors from the

13  company's inception to March 2002, and was its Vice President of Sales from

14  January 1997 to April 1999, and its Senior Vice President of Business

15  Development from April 1999 until January 2002.  Roah reported directly to

16  Bohan.

17        10.    Chantel J. Loo ("Loo") is a resident of Beverly Hills, California.  Loo

18  was hired as L90's Assistant Controller in May 2000, promoted to Controller in

19  August 2000, and became Director of Finance in mid-2001.  Loo was terminated

20  by L90 in April 2002.  Loo reported primarily to Bickerton.

21                                    **RELEVANT ENTITY**

22        11.    L90, Inc. was a Delaware corporation headquartered in Marina Del

23  Rey, California during the relevant period.  In July 2002, as part of a

24  reorganization and merger, L90 changed its name to MaxWorldwide, Inc., and

25  relocated to New York, New York.  L90 is an Internet advertising firm that

26  provides marketing services for both advertising clients and web publisher clients.

27  L90's stock is registered with the Commission under Section 12(g) of the

28  Exchange Act, 15 U.S.C. § 78l(g), and previously traded on the Nasdaq National

1  Market System.  L90's shares were delisted from Nasdaq on August 20, 2002,

2  because the Company failed to timely file its Form 10-Q for Q2 2002.

3       12.    In order to sell its common stock and other securities to members of

4  the public and maintain public trading of its securities, L90 was required to

5  comply with statutes, rules and regulations designed to ensure that its financial

6  information was accurately recorded and disclosed to the investing public.  Under

7  these statutes, rules and regulations, L90 had a duty to, among other things, (a)

8  make and keep books, records and accounts which, in reasonable detail, accurately

9  and fairly reflected its transactions and dispositions of assets; (b) devise and

10  maintain a system of internal accounting controls sufficient to provide reasonable

11  assurances that transactions are recorded as necessary to permit preparation of

12  financial statements in conformity with generally accepted accounting principles

13  and to maintain accountability for assets; (c) file with the Commission an annual

14  report on the appropriate form (known as a "Form 10-K") for each fiscal year

15  including a financial statement including a balance sheet and statements of income

16  and cash flows prepared in conformity with generally accepted accounting

17  principles and certified by an independent public accountant; and (d) file with the

18  Commission quarterly reports on the appropriate form (known as a "Form 10-Q")

19  for each of the first three quarters of each fiscal year including financial statements

20  that disclose its financial condition and results of business operations for each

21  three-month period.

22  **THE FRAUDULENT SCHEME**

23  **A.**    **Bohan And Bickerton Conceive The Fraudulent Barter Scheme And**

24         **Roah Implements The Barter Deals**

25       13.    In Q3 2000, Bohan and Bickerton met to discuss L90's financial

26  performance and the possibility that L90 would not meet analysts' revenue

27  estimates that quarter.  During this meeting, it was suggested that, in order to meet

28  analysts' estimates, L90 record barter revenue through webMillion and not

1  disclose in its financial statements that the revenue came from barter transactions.

2  Soon thereafter, it was determined to use barter transactions for the purpose of

3  inflating L90's revenues.

4      14.    In Q3 2000, Bohan informed Roah that L90 was going to be short on

5  revenue and that engaging in barter transactions would help L90 meet the

6  quarterly analysts' estimates.  Bohan then instructed Roah to set up barter

7  transactions to help L90 meet these quarterly expectations.  Bickerton also

8  instructed Roah to implement these revenue-generating barter transactions.

9  Further, Bohan and Bickerton told Roah that it was important to swap checks on

10 certain barter deals so that there would be evidence that L90 received the revenue

11 it was to record on such transactions.  As instructed, Roah negotiated and

12 implemented such barter transactions.

13     15.    Each month during the relevant period, Bickerton apprised Bohan of

14 L90's financial performance in order to determine whether any barter revenue

15 needed to be recorded to meet analysts' quarterly revenue estimates.  Bohan often

16 asked Roah if there was enough barter advertising running to meet analysts'

17 revenue estimates.  Roah implemented several barter deals at the same time and

18 ran advertising for these deals to ensure that there would be sufficient barter

19 revenue at the end of each quarter to meet analysts' estimates.

20 **B.    The Fraudulent Revenue-Generating Barter Transactions**

21     16.    From Q3 2000 through Q3 2001, the defendants engaged in

22 fraudulent conduct that resulted in purported revenue from ten barter transactions

23 being fraudulently recorded on L90's books.  In five of these transactions, L90

24 agreed to exchange Internet advertising on its proprietary website,

25 webMillion.com, with one other company, swapped checks of identical or similar

26 amounts with the same company, and recognized revenue on the money received

27 in the exchange.  In five other transactions, L90 agreed to exchange advertising on

28 webMillion with at least one other company, engaged in the round-tripping of

-6-

1 money through at least two other companies, and recognized revenue on money

2 received from the round-tripping.

3       17.   Bohan approved the use of the fraudulent barter transactions to inflate

4 L90's revenue; Bickerton facilitated the transactions and recorded, or ensured the

5 recording, of revenue from the transactions; Roah negotiated, structured, and

6 implemented the transactions; and Loo helped coordinate some of the check-swaps

7 and was involved in recording some of the transactions into L90's books and

8 records.

9       1.   **The Check-Swap Transactions**

10           a.   **The $211,094 Check-Swap**

11       18.   As set forth in the table below, from September 2000 to November

12 2000, L90 recognized $211,094 in revenue from a barter transaction and check

13 swap between webMillion and an online email service provider (the "Online Email

14 Co."):

| Date | L90 Disbursement | L90 Receipt | L90 Revenue Recognized | L90 Expense Recorded |
|---|---|---|---|---|
| 9/01/00 | | | $ 59,178 | |
| 10/01/00 | | | $ 67,917 | |
| 10/31/00 | | | | $230,000 |
| 11/01/00 | | | $ 83,999 | |
| 11/13/00 | $230,000 | | | |
| 11/28/00 | | $229,750 | | |
| **Total** | **$230,000** | **$229,750** | **$211,094** | **$230,000** |

23       19.   Bickerton signed the $230,000 check issued to the Online Email Co.,

24 instructed a subordinate to work on the check-swap with Loo, instructed Loo to

25 record an advertising expense for the deal, and ensured that L90 recorded revenue

26 for the deal. Roah was L90's sales account executive for this transaction and

27 communicated with the Online Email Co. regarding the terms and reciprocal

28 nature of the transaction. Loo communicated with the Online Email Co. regarding

1  the check exchange, provided the Online Email Co. with check and payment

2  information related to the deal, and prepared the L90 cash receipt register that

3  detailed the check received from the Online Email Co.

4        **b.**    **The $320,000 Check-Swap**

5      20.    As set forth in the table below, from December 2000 through April

6  2001, L90 recognized $320,000 in total revenue from a barter transaction and

7  check swap between webMillion and an online game company (the "Online Game

8  Co."):

| Date | L90 Disbursement | L90 Receipt | L90 Revenue Recognized | L90 Expense Recorded |
|---|---|---|---|---|
| 12/01/00 | | | $132,740.97 | |
| 1/01/01 | | | $ 34.39 | |
| 4/01/01 | | | $187,224.64 | |
| 4/12/01 | $320,000 | $320,000 | | |
| 4/30/01 | | | | $320,000 |
| **Total** | **$320,000** | **$320,000** | **$320,000** | **$320,000** |

16      21.    Roah approved the transaction with the Online Game Co.  Loo signed

17  the $320,000 check issued to the Online Game Co. and ensured that L90 recorded

18  an advertising expense for this transaction in its books.

19        **c.**    **The $500,000 Check-Swap**

20      22.    As set forth in the table below, in March 2001 L90 recognized

21  $500,000 in total revenue from a barter transaction and check swap between

22  webMillion and an online dating company (the "Online Dating Co."):

| Date | L90 Disbursement | L90 Receipt | L90 Revenue Recognized | L90 Expense Recorded |
|---|---|---|---|---|
| 3/01/01 | | | $500,000 | |
| 3/09/01 | $500,000 | $500,000 | | |
| **Total** | **$500,000** | **$500,000** | **$500,000** | **$0** |

28  *

1     23.    Roah negotiated the terms of the barter deal with the Online Dating

2 Co., was L90's sales account executive for the deal, and instructed Loo to

3 coordinate the check-swap.  Loo signed the $500,000 check issued to the Online

4 Dating Co., coordinated the check-swap with the Online Dating Co., and recorded

5 a journal entry posted into L90's general ledger reflecting the $500,000 check

6 received by L90.

7     **d.**    **The $99,082 Check-Swap**

8     24.    As set forth in the table below, in August 2000 L90 recognized

9 $99,082 in total revenue from a barter transaction and check swap between

10 webMillion and an online lottery company (the "Online Lottery Co."):

| Date | L90 Disbursement | L90 Receipt | L90 Revenue Recognized | L90 Expense Recorded |
|---|---|---|---|---|
| 8/01/00 | | | $99,082 | |
| 9/25/00 | $100,000 | | | $100,000 |
| 3/27/01 | | $99,082 | | |
| **Total** | **$100,000** | **$99,082** | **$99,082** | **$100,000** |

16     25.    Bickerton and Roah conceived and executed this transaction.

17 Bickerton instructed a subordinate to prepare the check for the Online Lottery Co.,

18 signed the check issued to the Online Lottery Co., and ensured that L90 recorded

19 revenue on this transaction.  Roah was L90's sales account executive for the deal,

20 negotiated the terms of the deal with the Online Lottery Co., coordinated the

21 signing of the insertion orders (i.e., advertising agreements) with the Online

22 Lottery Co., provided an L90 insertion order to the Online Lottery Co. that had a

23 forged signature, and facilitated the check-swap.

24     **e.**    **The $99,990 Check-Swap**

25     26.    As set forth in the table below, in September 2000 L90 recognized

26 $252,990 in total revenue from a second barter transaction and check swap

27 between webMillion and the Online Lottery Co.:

| Date | L90 Disbursement | L90 Receipt | L90 Revenue Recognized | L90 Expense Recorded |
|---|---|---|---|---|
| 9/01/00 | | | $252,990 | |
| 3/07/01 | $ 99,450 (part of a $146,870 check) | | | |
| 3/27/01 | | $99,990 | | |
| **Total** | **$99,450** | **$99,990** | **$252,990** | **$0** |

27.    Bickerton and Roah conceived and executed this transaction. Bickerton ensured that L90 recorded revenue on the transaction. Roah was L90's sales account executive for the deal, negotiated the terms of the transaction with the Online Lottery Co., and facilitated the check-swap. Loo approved an L90 insertion order related to the deal and signed the check issued to the Online Lottery Co.

### 2.    The Round-Trip Transactions

28.    In or about Q4 2000, after recognizing revenue from several of the check-swaps described above, Bohan told Bickerton that L90 needed to structure barter transactions that were not as risky. Specifically, Bohan explained to Bickerton that he wanted to insert a third party intermediary into the barter transactions to better hide the transactions from L90's auditor. Bohan arranged for a specific intermediary company (the "Intermediary") to be included in the barter transactions and instructed Bickerton to work with the Intermediary. Bohan also instructed Roah to use the Intermediary in the barter transactions.

### a.    The $1,000,000 Round-Trip Transaction

29.    From November 2000 to January 2001, L90 recognized $1,000,000 in total revenue from a barter transaction involving webMillion, the Intermediary, and a company that owned two entertainment websites (the "Online Entertainment Co."). As set forth in the diagram below, this transaction involved the round-trip movement of money between L90, the Intermediary, and the Online Entertainment

Co.:



30.   Bickerton instructed Roah to effect this round-trip transaction, communicated with the Intermediary regarding the deal, ensured that L90 recorded revenue from the deal, and signed the $930,000 wire transfer request. Roah was L90's sales account executive for the transaction, negotiated the terms of the transaction with the Online Entertainment Co., instructed L90 employees how to prepare the L90 insertion order related to the deal, communicated with the Online Entertainment Co. regarding the delivery of advertising by webMillion, and coordinated the movement of money.

**b.   The $1,098,000 Round-Trip Transaction**

31.   In March 2001, L90 recognized $1,098,000 in total revenue from a barter transaction involving webMillion, the Intermediary, and three Internet-related companies. As set forth in the diagram below, this transaction involved the round-trip movement of money between L90, the Intermediary, and three Internet-related companies:

*

*

*

*



32.     Bickerton informed the Intermediary of the three Internet-related companies participating in this transaction, provided the Intermediary with specific check and wiring instructions regarding the flow of money, communicated with the Intermediary about the Intermediary's fee related to the transaction, coordinated the round-trip movement of money, and ensured that L90 recorded revenue.  Roah was L90's sales account executive for the transaction, negotiated the terms of each leg of the barter transaction with the three Internet-related companies, instructed a subordinate to prepare L90 insertion orders related to the transaction, communicated with the Internet-related companies regarding signing L90's insertion orders, instructed a subordinate to improperly sign documents on behalf of the Intermediary, and communicated with the Internet-related companies regarding the movement of money.  Loo prepared and signed the $1,603,000 wire transfer request and approved recording a portion of the revenue from the transaction.

### c.     The $300,000 Round-Trip Transaction

33.     In June 2001, L90 recognized $300,000 in total revenue from a barter transaction involving webMillion, the Intermediary, and an online marketing company (the "Online Marketing Co.").  As set forth in the diagram below, this transaction involved the round-tripping of money between L90, the Intermediary, and the Online Marketing Co.:



34.    Bickerton approved an L90 insertion order for this transaction, instructed the Intermediary to issue the check to the Online Marketing Co., coordinated the movement of money with the Intermediary, signed the check issued to the Intermediary, and ensured that L90 recorded revenue.  Roah was L90's sales account executive for the deal, negotiated the barter transaction with the Online Marketing Co., communicated with the Online Marketing Co. regarding the insertion orders, and coordinated the movement of money with the Online Marketing Co.

**d.    The Two Round-Trip Transactions With Homestore**

35.    As discussed below, L90 recognized $500,000 in total revenue from two barter transactions involving Homestore.com, Inc.

**i.    The $250,000 Round-Trip Transaction for Q2 2001**

36.    In June 2001, L90 recognized $250,000 in total revenue from a barter transaction involving Homestore.  As part of this transaction, L90 received a wire transfer on July 20, 2001, of $4,250,000 from a third-party company (the "Third Party Co.") participating in the transaction, and then wired $4,000,000 to Homestore on the same date.

37.    In or about Q2 2001, a Homestore employee contacted Roah and told him that Homestore wanted to put together a barter deal with L90.  The Homestore employee also told Roah that Homestore would pay L90 a "leave behind" or commission of $250,000 for participating in the transaction.  Roah told

1   Bohan about this deal and that it would net L90 $250,000.

2       38.    Roah similarly discussed this barter transaction with Bickerton and

3   told her that L90 would receive $250,000 in cash for its participation. Bickerton

4   asked Bohan if he wanted L90 to participate in this deal. Bohan approved the

5   transaction and determined that L90 should record the $250,000 as revenue.

6       39.    Roah negotiated this round-trip transaction with the Homestore

7   employee, recommended to Homestore the participating Third Party Co., was

8   L90's sales account executive for the transaction, and provided wiring instructions

9   to the Third Party Co. Bickerton signed the $4,000,000 wire transfer request,

10   instructed a subordinate to wire the $4,000,000 to Homestore, and ensured that

11   L90 recorded revenue from this transaction. Loo signed the wire transfer request

12   and recorded a journal entry posted to L90's general ledger related to this

13   transaction.

14       40.    As part of this transaction, the Third Party Co. received a $300,000

15   commission and agreed to split this commission with Roah. On or about July 17,

16   2001, unbeknownst to the other defendants, Roah instructed the Third Party Co. to

17   wire $150,000 to Roah's own company, NTB Media. On or about July 20, 2001,

18   NTB Media received $150,000 from the Third Party Co., which Roah then

19   misappropriated for his own use.

20       **ii.**    **The $250,000 Round-Trip Transaction for Q3 2001**

21       41.    In September 2001, L90 recognized $250,000 in total revenue from a

22   second round-trip transaction involving Homestore. In this transaction, L90

23   received a wire transfer of $5,900,000 from a company participating in the

24   transaction (the "Participating Co.") on November 19, 2001, and then wired

25   $5,650,000 to Homestore on the same date.

26       42.    In or about Q3 2001, the Homestore employee contacted Roah about

27   setting up another round-trip transaction involving L90. Roah approached

28   Bickerton regarding this deal and asked her if she wanted to engage in another

1   transaction with Homestore that was similar to the previous transaction.  Bickerton

2   told Bohan about this deal, asked Bohan if he wanted to participate in this deal,

3   and told Bohan that L90 would only recognize the net amount of revenue from the

4   transaction.  Bohan approved this transaction and determined that L90 should

5   record the $250,000 as revenue.

6       43.     Roah negotiated the details of this round-trip transaction with

7   Homestore, recommended to Homestore the Participating Co., informed the

8   Participating Co. about the cash flow in the transaction, provided the Participating

9   Co. with specific check and wiring instructions, instructed the Participating Co. to

10  use a bogus address on an insertion order, signed insertion orders using the alias

11  "Larry Quest," and was L90's sales account executive for the transaction.

12  Bickerton ensured that L90 recorded $250,000 in revenue from the transaction.

13  Bohan and Loo signed the $5,650,000 wire transfer request.

14      44.     In addition, unbeknownst to the other defendants, Roah instructed the

15  Participating Co. to send $507,000 to his company, NTB Media, as part of this

16  transaction.  On or about November 28, 2001, NTB Media received the $507,000,

17  which Roah then misappropriated for his own use.

18                      iii.    **Roah Knowingly And Substantially Assisted**

19                              **Homestore Employees In Their Fraudulent Conduct**

20      45.     Certain former Homestore employees recorded or caused to be

21  recorded in Homestore's books inflated revenues in Q2 and Q3 2001 of up to $9.6

22  million pertaining to the above round-trip transactions involving L90.  These

23  inflated revenues were reported in Homestore's financial statements included in its

24  Q2 and Q3 2001 Forms 10-Q filed with the Commission.

25      46.     Roah knew that his conduct in the above transactions helped inflate

26  Homestore's revenues.  Moreover, on or about November 13, 2001, at the request

27  of several Homestore employees, Roah signed a confirmation letter for

28  Homestore's auditor.  This letter falsely confirmed that the total sales between

1  Homestore and webMillion in Q2 and Q3 2001 were $9.65 million and that there

2  were no "side arrangements" relating to these sales.

3    **3.    Fraudulent Revenue Recognition From The Barter Transactions**

4    47.    The essence of the check-swap and round-trip transactions was a

5  circular flow of money by which L90 improperly recognized revenue.  Generally

6  Accepted Accounting Principles ("GAAP") do not permit companies to recognize

7  revenue on transactions without any economic substance, such as the check swap

8  and round-trip transactions discussed above.

9  **C.    Bohan And Bickerton Implement The Fraudulent Advertising**

10   **Campaign**

11   48.    In a further attempt to boost L90's revenues, Bohan and Bickerton

12  conceived and implemented a scheme whereby L90 recognized total revenue of

13  $567,421, in December 2000 and January 2001, from an advertising campaign it

14  ran for another Internet company (the "Internet Co.").  L90 ran the advertising

15  campaign on webMillion in or about Q4 2000 and Q1 2001, but it never received

16  any payment for the campaign.  In Q2 2001, L90 wrote off the $567,421 as bad

17  debt.

18   49.    From the outset of this transaction, Bohan and Bickerton knew that

19  L90 would never receive payment from the Internet Co. and that L90 would have

20  to write off the $567,421 receivable in a subsequent quarter.  Nevertheless, Bohan

21  approved this transaction.  Further, after reviewing L90's accounting records to

22  ensure that this transaction would not be detected, Bickerton told Bohan that L90

23  could proceed with the transaction.  Bickerton recorded the revenue from this

24  transaction.  In or about Q2 2001, Bickerton told a subordinate not to reverse the

25  revenue or make any collection efforts on this campaign.

26   50.    The recording of revenue from this campaign was improper because

27  the collection of money was not "reasonably assured," as required by GAAP.

28  Further, Bohan and Bickerton concealed the fraudulent nature of the campaign

- 16 -

1    from L90's auditor.

2    **D.**    **The Defendants Lie to L90's Auditor**

3       **1.**    **Bohan, Bickerton, And Roah Deceive The Auditor Regarding The**

4          **Intermediary**

5       51.    As discussed above, in or about Q4 2001, Bohan determined to add

6    the Intermediary to the barter transactions to better hide the barter transactions

7    from L90's auditor. Bohan told Bickerton and Roah to work with the

8    Intermediary in structuring these transactions. Pursuant to Bohan's instructions,

9    Roah implemented the three transactions detailed above using the Intermediary

10   from Q4 2000 through Q2 2001. In connection with the 2000 audit and Q1 and

11   Q2 2001 financial statement reviews, Bohan, Bickerton, and Roah concealed

12   L90's use of the Intermediary from L90's auditor.

13      **2.**    **Bohan, Bickerton, And Loo Sign False Management**

14         **Representation Letters**

15      52.    The management representation letters provided to L90's auditor in

16   connection with its 2000 audit, and Q3 2000, and Q1, Q2, and Q3 2001 financial

17   statement reviews, included numerous false representations in light of the

18   concealed barter transactions. Specifically, these letters included the following

19   misrepresentations:

20      •    The financial statements were fairly presented in conformity with

21         GAAP and complied in all material respects with accounting

22         requirements of the Exchange Act and Commission rules and

23         regulations;

24      •    There were no material transactions that had not been properly

25         recorded in the accounting records underlying the financial

26         statements;

27      •    There had been no fraud involving management or employees who

28         had significant roles in internal control; and

1    • The accounting records underlying the financial statements accurately

2       and fairly reflected, in reasonable detail, the transactions of the

3       Company.

4    53.    Bohan and Loo signed each of the false management representation

5    letters provided to L90's auditor.  Additionally, Bickerton signed the false

6    management representation letters for Q3 2000, Fiscal Year 2000, and Q3 2001.

7    **3.    Roah Falsely Represents That Fraudulent Barter Deals Were**

8         **Legitimate Transactions**

9    54.    In connection with the Q1 2001 financial statement review, L90's

10   auditor raised questions regarding several large transactions that occurred near the

11   end of Q1 2001, including the $500,000 check-swap and $1,098,000 round-trip

12   transaction discussed above.  In response to these questions, Roah lied to L90's

13   auditor by telling it that the revenue related to these transactions was legitimate.

14   **4.    Bickerton Falsely Represents That L90 Did Not Engage In Barter**

15        **Transactions**

16   55.    Bickerton represented to L90's auditor in 1999 and early-to-mid 2000

17   that L90 would not engage in barter transactions.  Subsequently, Bickerton failed

18   to inform the auditor that L90 engaged in barter transactions and recognized barter

19   revenue from Q3 2000 through Q3 2001.  In addition, in early 2002, in connection

20   with the 2001 audit, Bickerton falsely represented to L90's auditor that L90 had

21   engaged in only the two barter transactions with Homestore.

22   **5.    Loo Deceives The Auditor**

23   56.    During the audit and quarterly reviews for Q3 2000 through Q3 2001,

24   Loo provided L90's auditor with supporting documentation for the auditor's

25   quarterly revenue selections.  Unbeknownst to L90's auditor, however, it had

26   selected and reviewed revenue related to eight of the ten barter transactions

27   discussed above.  Loo never disclosed to the auditor that she knew that some of

28   the eight revenue selections related to these barter transactions.  Further, when the

1  auditor asked Loo for information pertaining to L90's barter transactions in

2  connection with the 2001 audit, Loo responded by falsely stating that she knew of

3  only the two barter transactions involving Homestore.

4  **E.     Bohan And Roah Sign False Commission Filings**

5          57.     L90 reported revenue from the fraudulent barter transactions and

6  advertising campaign in its financial statements filed with the Commission.  As

7  shown in the table below, L90 reported these false financial results in its 2000

8  Form 10-K and its Q3 2000, Q1, Q2, and Q3 2001 Forms 10-Q.  L90 also filed in

9  May 2001 a registration on Form S-3 that incorporated by reference the 2000

10 Form 10-K, which included overstated revenue figures.  In addition, L90 issued

11 quarterly earnings releases that included the same false financial results as the

12 periodic filings discussed above.

|  | Q3 2000 | Q4 2000 | FY 2000 | Q1 2001 | Q2 2001 | Q3 2001 |
|---|---|---|---|---|---|---|
| Reported Revenue ($ in Millions) | 14.7 | 16.5 | 52.0 | 9.8 | 9.0 | 8.4 |
| Revenue Adjusted For Fraudulent Transactions | 14.3 | 15.2 | 50.3 | 7.6 | 8.3 | 8.1 |
| Overstated Revenue From Fraudulent Transactions ($ in Millions) | 0.4 | 1.3 | 1.7 | 2.2 | 0.7 | 0.3 |
| Percentage Overstatement of Revenue | 2.8% | 8.6% | 3.4% | 29.0% | 8.4% | 3.7% |

24         58.     Bohan signed each one of the false periodic filings and the

25 registration statement.  Roah signed the false 2000 Form 10-K and registration

26 statement.

27         59.     In May and June 2002, after the defendants were no longer employed

28 by the company, L90 restated its financial statements for 2000 and 2001.  These

1    restatements included the $4.9 million of revenue generated by the fraudulent

2    barter transactions and advertising campaign discussed above.

### FIRST CLAIM FOR RELIEF

### FRAUD IN THE OFFER OR SALE OF SECURITIES

### Violations of Section 17(a) of the Securities Act

### (Against All Defendants)

7    60.    The Commission realleges and incorporates by reference ¶¶ 1 through

8    59 above.

9    61.    Defendants Bohan, Bickerton, Roah and Loo, and each of them, by

10    engaging in the conduct described above, directly or indirectly, in the offer or sale

11    of securities by the use of means or instruments of transportation or

12    communication in interstate commerce or by use of the mails:

13        a.    with scienter, employed devices, schemes, or artifices to

14             defraud;

15        b.    obtained money or property by means of untrue statements of a

16             material fact or by omitting to state a material fact necessary in

17             order to make the statements made, in light of the

18             circumstances under which they were made, not misleading; or

19        c.    engaged in transactions, practices, or courses of business which

20             operated or would operate as a fraud or deceit upon the

21             purchaser.

22    62.    By engaging in the conduct described above, each of the defendants

23    violated, and unless restrained and enjoined will continue to violate, Section 17(a)

24    of the Securities Act, 15 U.S.C. § 77q(a).

25    *

26    *

27    *

28    *

## SECOND CLAIM FOR RELIEF

### FRAUD IN CONNECTION WITH THE

### PURCHASE OR SALE OF SECURITIES

### Violations of Section 10(b) of the Exchange Act

### and Rule 10b-5 thereunder

### (Against All Defendants)

### And Aiding And Abetting Violations of Section 10(b) of the Exchange Act and

### Rule 10b-5 Thereunder

### (Against Roah)

63.    The Commission realleges and incorporates by reference ¶¶ 1 through 59 above.

64.    Defendants Bohan, Bickerton, Roah and Loo, and each of them, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

        a.    employed devices, schemes, or artifices to defraud;

        b.    made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

        c.    engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

65.    By engaging in the conduct described above, each of the defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

66.     By engaging in the conduct described in ¶¶ 36 through 46 above, Roah knowingly provided substantial assistance to certain former Homestore employees in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

67.     By engaging in the conduct described above and pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), defendant Roah aided and abetted the violations by the former Homestore employees, and unless restrained and enjoined will continue to aid and abet violations, of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

**THIRD CLAIM FOR RELIEF**

**VIOLATIONS OF COMMISSION PERIODIC**

**REPORTING REQUIREMENTS**

**Aiding and Abetting Violations of**

**Section 13(a) of the Exchange Act,**

**and Rules 12b-20, 13a-1 and 13a-13 thereunder**

**(Against All Defendants)**

68.     The Commission realleges and incorporates by reference ¶¶ 1 through 59 above.

69.     L90 violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder, by filing with the Commission materially false and misleading quarterly and annual reports on Form 10-Q and Form 10-K for the third quarter of 2000, year-end 2000, and first, second, and third quarters of 2001.

70.     Defendants Bohan, Bickerton, Roah and Loo, and each of them, knowingly provided substantial assistance to L90 in violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder.

71.     By engaging in the conduct described above and pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), defendants Bohan, Bickerton, Roah and Loo aided and abetted L90's violations, and unless restrained and enjoined

1  will continue to aid and abet violations, of Section 13(a) of the Exchange Act, 15

2  U.S.C. § 78m(a), and Rules 12b-20, 13a-1 and 13a-13 thereunder, 17 C.F.R. §§

3  240.12b-20, 240.13a-1 & 240.13a-13.

4  ### FOURTH CLAIM FOR RELIEF

5  ### RECORD-KEEPING VIOLATIONS

6  ### Violations of Exchange Act

7  ### Rule 13b2-1

8  ### (Against All Defendants)

9  72.   The Commission realleges and incorporates by reference ¶¶ 1 through

10  59 above.

11  73.   By engaging in the conduct described above, defendants Bohan,

12  Bickerton, Roah and Loo violated Exchange Act Rule 13b2-1 by, directly or

13  indirectly, falsifying or causing to be falsified L90's books, records, and accounts

14  subject to Section 13(b)(2)(A) of the Exchange Act.  Unless restrained and

15  enjoined, defendants Bohan, Bickerton, Roah and Loo will continue to violate

16  Rule 13b2-1, 17 C.F.R. § 240.13b2-1.

17  ### FIFTH CLAIM FOR RELIEF

18  ### LYING TO AUDITORS

19  ### Violations of Exchange Act Rule 13b2-2

20  ### (Against All Defendants)

21  74.   The Commission realleges and incorporates by reference ¶¶ 1 through

22  59 above.

23  75.   By engaging in the conduct described above, and in connection with

24  audits or examinations of the financial statements of L90 and the preparation and

25  filing of statements and reports required to be filed with the Commission,

26  defendants Bohan, Bickerton, Roah and Loo, directly or indirectly, made or caused

27  to be made materially false or misleading statements to accountants and omitted to

28  state, or caused another person to omit to state to accountants, material facts

- 23 -

1  necessary in order to make statements made to the accountants, in light of the

2  circumstances under which such statements were made, not misleading.

3        76.    By reason of the foregoing, each of the defendants violated, and

4  unless restrained and enjoined will continue to violate, Exchange Act Rule 13b2-

5  2, 17 C.F.R. § 240.13b2-2.

6                         **SIXTH CLAIM FOR RELIEF**

7                        **INTERNAL CONTROL VIOLATIONS**

8              **Violations of Section 13(b)(5) of the Exchange Act**

9                          **(Against All Defendants)**

10       77.    The Commission realleges and incorporates by reference ¶¶ 1 through

11  59 above.

12       78.    By engaging in the conduct described above, defendants Bohan,

13  Bickerton, Roah and Loo violated Section 13(b)(5) of the Exchange Act by

14  circumventing or failing to implement a system of internal accounting controls,

15  and by knowingly falsifying books, records or accounts described in Section

16  13(b)(2) of the Exchange Act.  Unless restrained and enjoined, defendants Bohan,

17  Bickerton, Roah and Loo will continue to violate Section 13(b)(5) of the Exchange

18  Act, 15 U.S.C. § 78m(b)(5).

19                          **PRAYER FOR RELIEF**

20       WHEREFORE, the Commission respectfully requests that the Court:

21                                   **I.**

22       Issue findings of fact and conclusions of law that the defendants committed

23  the alleged violations.

24                                  **II.**

25       Issue judgments, in a form consistent with Fed. R. Civ. P. 65(d),

26  permanently enjoining each defendant and his or her agents, servants, employees

27  and attorneys, and those persons in active concert or participation with any of

28  them, who receive actual notice of the order by personal service or otherwise, and

1  each of them, from violating Section 17(a) of the Securities Act, Sections 10(b),

2  13(a), and 13(b)(5) of the Exchange Act, and Rules 10b-5, 12b-20, 13a-1, 13a-13,

3  13b2-1, and 13b2-2 thereunder.

### III.

5  Order defendants Bohan, Bickerton, Roah and Loo to disgorge all ill-gotten

6  gains from their illegal conduct, together with prejudgment interest thereon.

### IV.

8  Order defendants Bohan and Loo to pay civil penalties under Section 20(d)

9  of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange

10  Act, 15 U.S.C. § 78u(d)(3).

### V.

12  Enter an order, pursuant to Section 20(e) of the Securities Act, 15 U.S.C. §

13  77t(e) and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2),

14  prohibiting defendants Bohan, Bickerton, Roah and Loo, and each of them, from

15  acting as an officer or director of any issuer that has a class of securities registered

16  pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to

17  file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d).

### VI.

19  Retain jurisdiction of this action in accordance with the principles of equity

20  and the Federal Rules of Civil Procedure in order to implement and carry out the

21  terms of all orders and decrees that may be entered, or to entertain any suitable

22  application or motion for additional relief within the jurisdiction of this Court.

DATED:     April 23, 2003

Adam Schneir
Attorney for Plaintiff
Securities and Exchange Commission

- 25 -